IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CRAIG COLBOCH,

        Plaintiff,

    vs.                         Case No. 05-4143-SAC

MORRIS COMMUNICATIONS
COMPANY, LLC,

and

MCC RADIO, LLC,

        Defendants.

MEMORANDUM AND ORDER

This diversity jurisdiction case comes before the court on cross motions for summary judgment.  Plaintiff brings state law claims that defendants failed to pay him wages and vacation pay, breached an implied employment contract, breached their fiduciary duty, and defamed him.

**Uncontested facts**[1]

Morris Communications Company, LLC ("Morris

---

[1] The court's task of determining the uncontested facts has been greatly simplified by the parties' submission of multiple stipulations, which the court appreciates.

Communications") is a privately held media company with diversified holdings that include newspaper and magazine publishing, outdoor advertising, radio broadcasting, book publishing and distribution, visitor publications and online services.  Its radio broadcasting division is separately incorporated and operates as MCC Radio, LLC ("MCC Radio"). In 1995, Morris Communications acquired WIBW-AM, WIBW-FM, the Kansas Agriculture Network and the Kansas Information Network (collectively "WIBW"), located in Topeka, Kansas.

Plaintiff Craig Colboch had been employed at WIBW since 1985 and became employed with Morris Communications when it acquired WIBW in 1995.  At that time, he was the General Sales Manager.  Plaintiff was promoted to General Manager of the WIBW radio stations in or about 2000.  As General Manager, plaintiff was responsible for supervising WIBW employees, operating WIBW's radio stations and programs, and budgeting expenses and revenues at the local level.  In 2001, Michael Osterhout became the Vice President and Chief Operating Officer of MCC Radio, and plaintiff's direct manager.  Mr. Osterhout reported directly to William S. Morris, IV ("Mr. Morris") who was the President of Morris Communications and MCC Radio at all relevant times.

Plaintiff signed an employee acknowledgment policy on substance abuse on September 24, 1998, that stated that he has the right to terminate his "employment at any time, with or without cause, and that Morris Communications Corporation has a similar right."  Plaintiff signed a copy of MCC's electronic communications policy on March 23, 2001.  The Electronic Communications Policy prohibited use of MCC's computer systems to send sexually explicit messages or jokes.  The policy stated that if an employee received a message he or she believed violated the policy, the message should be forwarded to the "Corporate Human Resources Director or Manager."  The Electronic communications policy also stated, "Do not forward any such messages to any other person."

In February 2002, Morris Communications  received an anonymous complaint that plaintiff had violated MCC's Harassment Policy. Morris Communications  sent a corporate Human Resources representative to WIBW to investigate the anonymous complaint, but the investigation failed to discover facts corroborating the allegations.

As early as March 2003, Morris Communications  maintained an accounting policy manual that served (1) to "standardize [MCC's] accounting policies; (2) to ensure that appropriate internal accounting

controls are observed in each of the various business functions; and (3) to provide the Chief Accountants and others with a policy reference for use in their daily responsibilities and in training new employees." The accounting policy manual states: "It is the responsibility of the Publisher or General Manager and the Chief Accountant at each business unit to establish and maintain an effective system of internal control." Section 1.4.

The accounting policy manual contains a vacation accrual form that served as a guideline as to how vacation pay was to be calculated at Morris Communications' business units during the relevant time. **(Schedule A of manual.)** That schedule provides for accrued vacation pay to be calculated using "base pay per hour," and does not mention commissions. According to policy and practice, WIBW employees were paid their base salary on a regular pay cycle every other Friday, while commissions and overrides based on business billed the prior month were paid on the second regular pay day each month.

As early as 2003, Morris Communications  maintained a no-harassment policy that prohibits harassment based on sex, among other protected classes. On September 23, 2004, plaintiff executed a copy of Morris Communications' harassment policy, but admits that he knew of

4

the existence of a harassment policy prior to that date.  The policy defines sexual harassment as "unwelcome sexual advances," and states that "harassment includes, but is not limited to, slurs, jokes and other verbal, graphic, or physical conduct."  The harassment policy additionally states that any violation of the policy may result in disciplinary action, up to and including discharge.  This harassment policy is contained in the policy manual and is also a stand-alone document that the company expects to be distributed to employees upon hire and at various times during their employment.

Plaintiff was provided a copy of Morris Communications' policy manual for managers dated July 23, 2004.  Before that date, defendants' policies, including its progressive discipline policy, had been submitted orally to plaintiff.  The introduction to the policy manual states:

> The policies, procedures, and programs outlined in this policy manual are designed to serve as guidelines to help all employees to be successful during their career with our organization. They are not intended to create any kind of contractual relationship and are subject to change at Morris Communications Company's discretion, with or without notice.

Dk. 183 Exh. C, p. 3.

The policy manual additionally contains the following general disclaimer and statement of at-will employment policy:

5

No policy, procedure or program in this handbook is intended to create a contract, expressed or implied, binding the employee or Morris Communications Company to an agreement of employment for a specific period of time. An employee's employment can be terminated by either the employee or Morris Communications Company at any time, for any reason, or for no reason, with or without notice. No representative or agent of Morris Communications Company, other than the Chairman or President, can authorize or sign an employment agreement contrary to the above terms or otherwise make any binding offer of employment for a specific term.

Dk. 183, Exh. C, p. 3.

The procedure for investigating complaints of harassment is included in the policy manual. The investigation procedures state that all formal harassment complaints will be investigated, that the company complaint procedures will be initiated and followed, that the Human Resources department is responsible for ensuring that an impartial investigation begins immediately after a complaint has been filed, and that Morris Communications "attempts to complete investigations within 10 working days." The policy further provides that the primary investigator should be accompanied by a second person during all interviews with the complainant, respondent, and witnesses so that information obtained during the interviews can be corroborated. The Policy Manual additionally provides that the individual conducting a harassment investigation will prepare a report and recommendation immediately upon the completion of

6

the investigation.

The policy manual also contains a progressive discipline policy ("PDP") that provides a guideline for disciplinary procedures.  The progressive disciplinary policy states it was created to "maintain an orderly, safe and efficient work environment" and to "respond to and correct inappropriate employee behavior or conduct."   It provides in part:

> In most circumstances, Morris does not assess disciplinary penalties against workers without conducting an objective inquiry, which ordinarily includes an opportunity for employees to explain or defend their actions.  For certain serious policy violations – for example, theft, assault on another employee, or a willful violation of a safety rule that could produce a life-threatening situation – Morris Communications Company might find it necessary to discharge a worker for a first offense.  However, most policy violations, as well as poor or unacceptable work performance, are handled using the appropriate discipline outlined below.

Dk. 183 Exh. C, p. 87.

The progressive discipline policy then outlines the following disciplinary events:  counseling, written warning, suspension, and termination of employment.  The termination section states solely:  "When all efforts to correct the employee's work performance have failed, employment with Morris Communications Company is terminated."  The progressive discipline policy concludes by stating:

Supervisors can modify any of the above discipline to reflect

7

mitigating circumstances, or the employee's past record. Modifications can include additional warnings, demotion, or immediate termination of employment, as appropriate. Morris Communications Company can supersede, modify, revise, or deviate from this policy at its sole discretion.

*Id.*

Mr. Osterhout and plaintiff typically set the revenue, salary, and expense budgets for WIBW operations late in the year preceding the budget calendar year. The 2004 WIBW budget, as approved by upper management in early 2004, included an expected operating cash/flow or profit of approximately $601,000 by the end of 2004.  The 2004 WIBW budget set the total amount of operating expenses at no more than $4,303,590.  WIBW produced monthly consolidated income reports that reflected the actual monthly income and expenses for each WIBW department and compared those figures to the amount budgeted in each category.

Plaintiff's compensation from WIBW in 2004 consisted of a base salary of nearly $60,000 and a monthly commission override of 3.2% of the net monthly revenue WIBW earned.  Plaintiff's base salary and the percentage of his override were established in conjunction with the setting of the budget.

8

In April of 2004, Juliet Stern was hired as a controller and business manager to work with MCC's Topeka and Salina radio stations. As early as May 2004, WIBW was over budget with respect to expenses according to the monthly consolidated income statements. Ms. Stern investigated the excessive expenses and discovered a number of unbudgeted expenditures.

WIBW's expenses exceeded budget in 2004. In July 2004, Mr. Osterhout informed plaintiff that he needed to reduce expenses by $200,000. In response to this directive, plaintiff initiated a reduction-in-force in August 2004 during which he laid-off six employees, including Jennifer Anshutz, Jamie Annett and Kimberly Lacey. Plaintiff stated he selected these three employees as part of the reduction in force because they were not good at their respective jobs and other employees had complained to him about their performance. No one conducted exit interviews of any of the individuals laid off in August 2004. On September 23, 2004, Dennis Kelly, Controller for MCC's Radio Division, sent President Morris a memorandum indicating that WIBW's expenses were more than $400,000 over budget, despite the August 2004 layoffs.

In November of 2004, plaintiff went to Augusta, Georgia for the

managers' planning conference.   During that budgeting process for 2005,
plaintiff told Mr. Osterhout that he had received several job offers but would
not accept any because he expected to be employed with defendants
through 2005.  That same month, plaintiff had a conference call with
President Morris, Dennis Kelly, and Mr. Osterhout to discuss the excessive
expenses at WIBW radio station, and met with Mr. Osterhout and Bill
Kentling, WIBW's General Sales Manager, to discuss the draft budget for
the 2005 calendar year.

In August of 2004, MCC's corporate Human Resources
Department received a second anonymous complaint alleging that plaintiff
had violated the company's harassment policy.  In response to that
complaint, Russ Harlan of MCC's corporate Human Resources Department
went to WIBW on September 1, 2004 and interviewed twenty-eight
persons.  He found no evidence of harassing behavior, and concluded in
his written report of his investigation: "there were no reports of personally
objectionable comments or behavior, of an atmosphere of harassment, or
of behavior that might be described as a hostile work environment."

In October of 2004, MCC's corporate Human Resources
Department received a letter dated October 4, 2004 from an attorney

representing Jamie Annett which threatened litigation against defendants.

That demand letter alleged that plaintiff had subjected Ms. Annett to a

"continuous stream of demeaning and sexual comments and acts," and

then terminated her in retaliation for resisting his overtures.  In response to

the demand letter, Martha Jean McHaney, MCC's Vice President of Human

Resources, met plaintiff in Topeka on October 20, 2004.

Ms. McHaney showed plaintiff the letter written by Ms. Annett's

attorney  and questioned him about its allegations.  When asked whether

any of the allegations in the letter were true, plaintiff admitted that he had

taken Ms. Annett to lunch in Kansas City, Missouri and had purchased a

gift for her as a reward for doing a good job, but said that he had

purchased gifts for other employees as well. Plaintiff denied the remaining

allegations in the letter, including allegations of harassment.  Ms. McHaney

informed plaintiff that she would investigate the claims.

In November of 2004, plaintiff received a Notice from the Equal

Employment Opportunity Commission ("EEOC") that Jennifer Anshutz, one

of the other women laid off in the August 2004 reduction-in-force, had filed

a charge of discrimination.  The charge stated, "I was sexually harassed

due to my sex, female.  I believe that I was selected for lay off because I

did not welcome the harassment.  I also believe that I was laid off in retaliation for a complaint that I made concerning the sexual harassment.  I allege that the above is a violation of Title VII of the Civil Rights Act."  The Anshutz EEOC Charge was forwarded to MCC's corporate Human Resources Department.

On December 1, 2004, Ms. McHaney and MCC's legal counsel interviewed Ms. Annett regarding her allegations.  During that interview, Ms. Annett reported that plaintiff began making sexual comments and innuendos to her a few months after she had begun working at WIBW.  Ms. Annett also reported that plaintiff told her how good her breasts looked and discussed breast augmentation with her; asked her to wear provocative and revealing clothing; commented on her buttocks and abdomen; lifted up her shirt to expose or rub her abdomen; took her to Kansas City, Missouri for lunch where he purchased her clothing; asked her about her proclivity for sex with other women, masturbation, and other sexual acts; and showed her photos of nude women and video clips of a woman performing fellatio.

Additionally, Ms. Annett reported that other women had complained to her about plaintiff.  She stated that former employee Jennifer

Lord-Palmer had complained to her that plaintiff had commented about her navel ring, breasts and butt. Ms. Annett related that Michelle "Chele" Kuhn, another WIBW employee, also complained that plaintiff had shown her photographs of naked women on his office computer and told her details of his sexual exploits with multiple women. Ms. Annett also informed Ms. McHaney that another WIBW employee, Kim Stolle, and Jennifer Anshutz told Ms. Annett that plaintiff had made sexual comments to them.  Ms. Annette said that Ms. Stolle told her that plaintiff had brought flowers to her home and Ms. Anshutz told her that plaintiff had touched her inappropriately.

On December 2, 2004, Ms. McHaney went to WIBW and interviewed several employees including Juliet Stern, Megan Mosack, Misty Jensen, Carla Newman, and Liz Montano regarding Ms. Annett and Ms. Anshutz's claims of sexual harassment.  During that interview, Ms. Montano informed Ms. McHaney that plaintiff had a reputation as a "womanizer" and that she had been informed that plaintiff had made sexual comments to former employees Jennifer Lord and Kelly Lentz that made these women feel uncomfortable.  Also during that interview, Ms. Stern told Ms. McHaney that she heard plaintiff telling dirty jokes to other WIBW

employees and that when he referenced the individuals he laid off in August 2004, including Ms.Annett and Ms. Anshutz, he said he had gotten rid of the "troublemakers". Ms. Stern also reported that Jamie Annett had told her that plaintiff had taken her to Kansas City, Missouri for lunch.

On December 3, 2004, Ms. McHaney met with WIBW employees Michelle "Chele" Kuhn and Keith Liesmann. Ms. Kuhn, who stated that she was afraid and very reluctant to come forward, reported that plaintiff had encouraged her to stay home on September 1, 2004 when Russ Harlan had visited WIBW to investigate the second anonymous complaint of sexual harassment that had been lodged against plaintiff. Ms. Kuhn also reported that she had witnessed plaintiff slap WIBW employee Carla Newman's butt, lift Ms. Anshutz's shirt and rub her abdomen, and heard plaintiff tell dirty jokes. In addition, Ms. Kuhn told Ms. McHaney that plaintiff had bragged to her that he and his then girlfriend, former employee Torri Morris, engaged in "threesomes".

On December 8, 2004, Ms. McHaney spoke to several current and former WIBW employees via telephone with whom she had not previously spoken, including Kim Lacey and Kim Stolle. During her December 8, 2004 interview, Ms. Lacey told Ms. McHaney that she had

14

seen plaintiff slap women on their butts that she heard plaintiff tell dirty jokes, and that plaintiff had sent her filthy e-mails.  Ms. Lacey also reported that when she bent down to pick up some envelopes she dropped during a Christmas party, plaintiff made a sexual innuendo in front of several people about Ms. Lacey performing fellatio on him.   Kim Stolle informed Ms. McHaney that sexual overtones and behavior were accepted by WIBW's prior owners and that it had been going on for years. Ms. Stolle expressed her opinion that plaintiff needed some type of assistance to deal with his conduct.  Some of the persons interviewed by Ms. McHaney had also been interviewed two months previously by Mr.Harlan during his unfruitful investigation of an anonymous complaint.

Ms. McHaney did not have a second person accompany her during all interviews she took in her investigation, did not complete her investigation within ten days of receiving the complaint, and did not make a written report at the conclusion of her investigation.  Instead, she provided an oral report to President Morris.

President Morris testified that he decided to terminate plaintiff for violating MCC's harassment policy and for failing to meet WIBW's 2004 budget with respect to expenses.   WIBW's 2004 year-end consolidated

15

income statement showed that the station's operating expenditures for 2004 were $883,000 over budget.  WIBW's 2004 year-end consolidated income statement also showed that the station's operating cash flow or profits in 2004 were $564,000 under budget.

On December 13, 2004, Mr. Morris, Mr. Osterhout and Ms. McHaney flew to Topeka, Kansas where Mr. Morris informed plaintiff of his immediate termination.  At the time, plaintiff had no written reprimands in his personnel file.  That same day, President Morris held an all- staff meeting with WIBW employees.  The parties dispute the content of some statements made during that meeting which serve as the basis for plaintiff's claim of defamation.  The parties agree that President Morris told staff that plaintiff was no longer associated with the defendants, that defendants did not tolerate harassment, that no one is above policies, and that a 1-800 number was available to report any sort of harassment.  The parties agree that President Morris looked angry and upset while addressing staff during this meeting.  Some employees recall President Morris stating that plaintiff was fired and that there was a culture of discrimination at the station, and some inferred from his statements that plaintiff was a sexual harasser.

Following his termination in December of 2004, Plaintiff wrote

16

an undated letter to Mr. "Billy Morris," complaining about the investigation, his termination and the fact that he did not receive severance pay.  William S. Morris III, the Chairman and CEO of Morris Communications, responded to plaintiff's letter informing him that (1) Morris Communications generally did not provide severance packages to employees terminated for violation of company policy; and (2) that plaintiff had violated "not one, but several of Morris Communications' policies and procedures," and that plaintiff's termination was necessary in order to protect WIBW"s employees and the integrity and reputation of Morris Communications.  Dk. 183, Exh. J.

On January 11, 2005, Morris Communications settled the Jamie Annett claim.  On May 23, 2005, Kimberly Lacey, filed an EEOC Charge alleging that plaintiff had sexually harassed her between 2000 and 2004 and had retaliated against her for rejecting his sexual advances.  The EEOC found cause to credit both the Anshutz  and Lacey EEOC charges and sent the matters to conciliation where both settled in October 2005. The conciliation agreement requires defendants to train all management employees at their time of hire and on an annual basis thereafter on what sexual harassment is, how to prevent it, and what the employer's complaint procedure is.  Before 2005, defendants did not train managers or

17

employees of WIBW about sexual harassment.

On the next regular pay day after his termination, plaintiff was issued his final paycheck from WIBW consisting of his base salary and accrued vacation.  Plaintiff's final vacation pay of $4,964.75 was calculated based on plaintiff's base salary and did not include his override.  Plaintiff was informed that he would receive a check in January 2004, on the regularly scheduled commission pay day for his December 2004 override. The parties dispute the proper amount and standard procedure for payment of plaintiff's final vacation pay and final override.  Defendants offered plaintiff COBRA benefits after his termination despite the provision in their Policy Manual that "[e]mployees discharged for gross misconduct cannot be allowed to continue coverage under Morris Communications Company's group health plan."  Dk. 183, Exh. C, p. 24.  Defendants did not oppose plaintiff's application for unemployment benefits, which was granted.

After his termination, plaintiff applied for positions with other media companies in the Topeka area but received no interviews or job offers.  Plaintiff alleges that before he was fired, he received weekly job offers from other media companies.  Thereafter, plaintiff filed this suit,

alleging that defendants failed to pay him the correct amount of wages and vacation pay, breached an implied contract of employment, breached their fiduciary duty, and defamed him.

**Summary Judgment Standard**

An important function of summary judgment is to eliminate factually unsupported claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.* at 323. The court considers the 'factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."' *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1182-83 (quoting *Blue Circle Cement, Inc. v. Bd. of County Comm'rs.*, 27 F.3d 1499, 1503 (10th Cir. 1994)); *see also* Fed. R. Civ. P. 56(c). "Summary judgment is appropriate if the non-moving party cannot adduce probative evidence on an element of its claim upon which it bears the burden of proof." *Rohrbaugh*, 53 F.3d at 1183. "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Muskogee*, 119 F.3d 837, 839

19

(10th Cir. 1997).

Once the movant demonstrates no genuine issue of material fact, the nonmovant is given "wide berth to prove a factual controversy exists." *Jeffries v. Kansas, Dep't of Soc. & Rehab. Servs.*, 147 F.3d 1220, 1228 (10th Cir. 1998) (quotation omitted).  Unsupported conclusory allegations, however, do not create an issue of fact.  *Salehpoor v. Shahinpoor,* 358 F.3d 782, 789 (10th Cir. 2004).  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby*, 477 U.S. 242, at 251-52 (1986).

**Defendants' summary judgment motion**

### Implied contract

Plaintiff first contends that defendants breached an implied contract that his employment would not be terminated absent good cause, progressive discipline, and compliance with the specified investigation

procedures for alleged sexual harassment.  Defendants counter that

plaintiff was an employee at will whose employment could be terminated

for any reason or for no reason at all, subject to exceptions not applicable

in this case. *Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841, 846

(Kan. 1987).  Defendants further contend that their policies did not

constitute an implied contract of employment, but that even if they did,

good cause existed for plaintiff's termination.

        Defendants rely in large part upon the language in their policy

manual to the effect that the manual is not intended to create any kind of

contractual relationship, express or implied, is subject to change at Morris

Communications Company's discretion, with or without notice.  Defendants'

policy manual additionally contains the following general disclaimer and

statement of at-will employment policy:

> No policy, procedure or program in this handbook is intended to
> create a contract, expressed or implied, binding the employee or
> Morris Communications Company to an agreement of employment
> for a specific period of time. An employee's employment can be
> terminated by either the employee or Morris Communications
> Company at any time, for any reason, or for no reason, with or
> without notice. No representative or agent of Morris Communications
> Company, other than the Chairman or President, can authorize or
> sign an employment agreement contrary to the above terms or
> otherwise make any binding offer of employment for a specific term.

Dk. 183, Exh. C, p. 3.

Although a disclaimer does not necessarily preclude the formation of an implied contract of employment, *see, e.g., Morriss*, 738 P.2d at 849, a disclaimer signed by a plaintiff can be dispositive of the employer's intent. *Buckley v. Keebler Co.*, 1998 WL 314566, *3 (10th Cir. 1998). Plaintiff signed an employee acknowledgment policy on substance abuse on September 24, 1998, which stated that he has the right to terminate his "employment at any time, with or without cause, and that Morris Communications Corporation has a similar right."[2] The language of this disclaimer unequivocally establishes defendant's intent to create an employment-at-will relationship. *See Kastner v. Blue Cross and Blue Shield of Kansas, Inc., 21 Kan. App. 2d 16* (1995) ("A more absolute declaration of intent on the part of [the employer] to create an unqualified employment-at-will relationship is difficult to envision."); *Buckley* at *5.

---

[2]Plaintiff's contention  that he does not recall reading the termination language in this policy, or the disclaimer in the policy manual, does not assist plaintiff. A party to a contract has a duty to read the contract before signing it, and his failure to read a contract does not make the contract less binding. *Miner v. Farm Bur. Mut. Ins. Co., Inc.*, 17 Kan. App. 2d 598, 609 (1992), *rev. denied* 252 Kan. 1092 (1993). Additionally, it is questionable whether plaintiff can maintain an implied contract theory based in part upon the policy manual where he is unaware of the policy until after termination. *See Rhoads v. Wal-Mart Stores, Inc.*, 83 F.3d 433,1996 WL 194854, *2 (10th Cir.1996), *citing Kuta v. Joint Dist. No. 50(J)*, 799 P.2d 379, 382 (Colo.1990).

Plaintiff contends that defendant's "at will" disclaimer is contradicted and restricted by other provisions in defendants' policy manual.  The court thus reviews the evidence to determine whether the record contains sufficient evidence to raise a material question of fact that defendant's policies or procedures altered plaintiff's at-will employment by creating an implied contract.

Although the question whether an implied contract exists is normally a question of fact for the jury, *see Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 537 (10th Cir. 1995), *Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841, 848 (Kan. 1987), summary judgment is proper where the plaintiff presents only evidence of his own unilateral expectations of continued employment.  *Buckley v. Keebler Co.*, 153 F.3d 726, 1998 WL 314566, *2 (10th  Cir. 1998).  There is no "meeting of the minds" created by unilateral expectations of an employee. *Conyers v. Safelite Glass Corp.*, 825 F. Supp. 974 (D. Kan. 1993). Bargaining is an essential prerequisite. *Conaway*, 853 F.2d at 794. Past practice is not enough.  *Berry v. General Motors Corp.*, 56 F.3d 1233, 1237 (10th Cir. 1995).

Under Kansas law, the following factors are pertinent to the intention to form a binding contract, evidencing a "meeting of the minds."

*Sidwell Oil & Gas Co. v. Loyd*, 230 Kan. 77, 630 P.2d 1107.

> Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced."

*Morris v. Coleman Co., Inc.*, 241 Kan. 501, 513 (987) (quoting *Allegri v. Providence-St. Margaret Health Ctr.*, 9 Kan. App. 2d 659 (Kan. Ct. App.1984)).

Plaintiff points to several sections of the policy manual as contradictions and substantive restrictions sufficient to form an implied contract. First, plaintiff contends that the progressive disciplinary policy creates such a restriction. Plaintiff contends that by listing specific acts of misconduct which could result in termination for a first offense, defendants implied that cause is required for termination. Defendants' policy manual states: "For certain serious policy violations – for example, theft, assault on another employee, or a willful violation of a safety rule that could produce a life-threatening situation – Morris Communications Company might find it necessary to discharge a worker for a first offense. However, most policy

24

violations, as well as poor or unacceptable work performance, are handled using the appropriate discipline outlined below." Dk. 183, Exh. C, p. 87. The court finds that defendants' list of non-exclusive examples of behavior indicates only that good cause is sufficient to warrant immediate termination, but does not indicate that good cause is necessary for all terminations.

Plaintiff additionally alleges that the progressive discipline policy establishes mandatory steps which the employer must take sequentially, prior to termination, thus an employee must be given counseling, then a written warning, followed by suspension, and only then, termination of employment. The court disagrees. Absent from defendant's policy is any language to the effect that the listed corrective actions must each be taken prior to termination, or must be taken progressively in their order of increasing severity. *Compare Allegri*, 9 Kan. App. 2d at 662. Plaintiff additionally points to language providing, "When all efforts to correct the employee's work performance have failed, employment with Morris Communications Company is terminated." Dk. 183, Exh. C, p. 87. Although plaintiff was terminated without having been given any counseling, written warning or suspension related to sexual harassment, he

25

incorrectly reads the above language to mean that "only when all efforts to correct " the behavior have failed will an employee be terminated.  Dk. 183, p. 39.

Defendants' progressive discipline policy clearly reveals defendants' intent not to create a mandatory contractual provision by:  1) reserving the right to modify any of the stated progressive disciplines; 2) including "immediate termination of employment" as such a modification, and 3) clearly stating the company's right to "modify, revise, or deviate from this policy at its sole discretion." Dk. 183, Exh. C, p. 87.  The language of defendants' policy fails to give rise to a material question of fact whether cause is required for termination.

Plaintiff additionally points to testimony from himself, from defendants' current General Manager, and from Ms. McHaney to the effect that the progressive discipline policy must be followed, that it was followed, and that its use was encouraged when appropriate.  Dk. 183, p. 39.  That defendants have a progressive discipline policy, train their managers on its use, and encourage and enforce  its use is good business practice.  But the policy itself, as written and as applied, does not require defendants to march lock-step through each of the disciplinary options in every event

before terminating any individual.  Thus defendants' application of the policy fails to give rise to a material question of fact whether cause is required for termination.

Plaintiff also contends that because one reason for his termination was his failure to meet budgeted expenses, "defendants should be estopped from claiming that they do not have to follow their Progressive Discipline Policy."  *Id.*, p. 39.  Although this argument is not well-developed, the court believes that plaintiff hereby contends that the "budget deficit" reason for plaintiff's termination did not warrant immediate termination and that defendants were therefore obliged to impose discipline less severe than termination.  The court disagrees.  Where, as here, an employer has knowledge of facts severe enough to justify immediate termination, it need not ignore those facts merely because an independent reason for discipline also exists which, if considered in isolation, may not warrant immediate termination.

The court next addresses plaintiff's contention that defendants' sexual harassment policy in the policy manual implies that an employee can be terminated only for cause.  Plaintiff relies upon testimony by defendant's President and Vice President of Human Resources to the

27

effect that there is mutuality in the harassment policy, that the policy creates an obligation on defendant to adequately investigate formal complaints of sexual harassment, and that employees could rely upon that obligation to investigate and follow company complaint procedures.  Dk. 183, p. 40.  This contention relates more squarely to plaintiff's contention regarding inadequate investigations, addressed below.

Plaintiff overlooks the policy manual's specific language regarding discipline for sexual harassment. The sexual harassment disciplinary provision states: "Employees who violate this policy are subject to appropriate discipline.  If an investigation results in a finding that this policy has been violated, the mandatory minimum discipline is a final written reprimand."  Dk. 183, Exh. C, p. 48.  This is inconsistent with plaintiff's interpretation of the general progressive disciplinary policy that the minimum discipline for a violation of the sexual harassment policy is the first "step" - counseling. The sexual harassment policy in the policy manual, when read in conjunction with the rest of that manual, fails to give rise to a reasonable implication that an employee can be terminated only for cause.

The stand-alone employee harassment policy makes that point clear by stating in all capital letters, in contrast to the rest of the form:

VIOLATION OF THIS POLICY WILL SUBJECT AN EMPLOYEE TO

DISCIPLINARY ACTION, UP TO AND INCLUDING IMMEDIATE

DISCHARGE.

Dk. 183, Exh. E, p. 1.  This language indicates that defendants expressly

reserved the right not to follow any of the disciplinary options set forth in

the general progressive disciplinary policy prior to terminating an employee

for violation of the sexual harassment policy.

        The court next addresses plaintiff's contention that the

investigation procedures stated in the policy manual restricts defendant's

right to terminate at will.  The court finds that the investigation procedures

upon which plaintiff relies are triggered only by internal complaints made by

defendants' employees.[3]  Nothing in the policy manual obligates

defendants to use those same investigation procedures when answering

an EEOC charge or defending a potential lawsuit brought by a person who

is no longer an employee, as defendants were doing at all times after

October of 2004 in investigating the assertions of sexual harassment

_____

        [3]*See* Dk. 183, Exh. C, p. 45-46 (stating, among other examples, that
"any employee" who feels she has been harassed should take specified
action, that "If the employee makes a formal complaint, the company
complaint procedures will be initiated and followed," and that "a formal
report will be reviewed with the complaining employee after the
investigation.")

against plaintiff.  Defendants' practice was not to follow the investigation procedures in the policy manual when faced with a threat of litigation.  Dk. 176, Exh. 14-2 (McHaney depo.), p. 8 of 19.

In the alternative, the court finds no genuine issue of material fact that  plaintiff's investigation procedures, as stated or as applied, give rise to an implied contract.  Defendants' investigation procedures state "... a second person should accompany the primary investigator during all interviews with the complainant, respondent, and witnesses so that information obtained during the interviews can be corroborated."  Dk. 183, Exh. C, p. 47.  Assuming, *arguendo*, that this language applies, the court finds it to be merely suggestive and not mandatory.  Although it is good business practice to have another person present during interviews in addition to the primary investigator, neither the law nor defendant's policy manual requires it.

Plaintiff is also correct that Ms. McHaney failed to complete her investigation within ten days of receiving the sexual harassment complaint and failed to submit a written report of her findings.  Defendants' policy provides:

> The Human Resources department is responsible for ensuring that
> an impartial investigation begins immediately after a complaint has
> been filed.  Morris Communications Company attempts to complete

30

investigations within 10 working days... The designated investigator prepares a report and recommendation immediately following the completion of the investigation.  Except in the most unusual circumstances, the report must be completed within 10 working days after the completion of the investigation.

Dk. 183, Exh. C, p. 47.  Other sections clarify that the report is to be written and not merely oral.[4]

Assuming *arguendo* that this language applies, the court finds that the circumstances of this case were "most unusual."  Here, anonymous allegations of harassment by plaintiff had been investigated twice before Ms. McHaney began her investigation.  The most recent prior investigation during which 28 employees were interviewed had concluded just one month before defendants received the Annett demand letter which prompted Ms. McHaney's investigation.  The closeness in time and apparent similarity of prior complaints to Annett's charge, which weigh against plaintiff and in favor of swift action, balanced against defendant's knowledge that extensive prior investigations had uncovered no factual support, which weigh in favor of plaintiff and against repetition of recent

---

[4]*See* policy manual, Dk. 183, Exh. C(2) p. 46 (stating that the H.R. department is responsible for "the preparation of a written report and recommendation...") ; p. 48 (stating that "a copy of the report and recommendation should be sent" to certain persons.) See also stand- alone harassment policy, Dk. 183, Exh. E, p. 1.

31

investigation, would warrant a reasonable employer in taking time to decide upon the proper course of action.  Once the investigation began, defendant received yet another EEOC charge.  These circumstances, coupled with the numerosity of witnesses whose testimony needed to be compiled and analyzed, constitute unusual circumstances warranting more than ten days in which to complete the investigation.  Because of the severity of the acts many employees stated plaintiff had repeatedly engaged in and the length of time it would take to compile a written report, a verbal report in lieu of a written report was reasonable to enable prompt remedial action.

Plaintiff additionally contends that the investigation was inadequate because Ms. McHaney should have given plaintiff an opportunity to respond after the completion of her investigation, asked different follow-up questions, interviewed different persons, and spoken to supervisors of the persons she interviewed regarding the interviewee's credibility.  The record reflects that plaintiff was given an opportunity to respond to the initial charges of sexual harassment which gave rise to the investigation and which were its focus.  Additional allegations gathered during the investigation were no different in kind than the initial complaint. Although the additional procedures suggested by plaintiff may or may not have benefitted him, they would certainly have lengthened an already

extensive investigation and are neither required by defendants own policies or the law.  The court finds no support for plaintiff's claim that the investigation procedures stated in the policy manual restrict defendant's right to terminate at will and require termination for cause only.

Viewed in its entirety, defendants' policy manual lacks the significant attributes identified by courts in finding questions of material fact on the issue of an implied contract.  *See e.g.,Johnson v. City of Wichita*, 687 F. Supp. 1501, 1507 (D. Kan. 1988) (personnel regulations stating discharge only for cause and manual listing grounds for dismissal); *Kistler v. Life Care Centers of America, Inc.*, 620 F. Supp. 1268, 1270 (D. Kan.1985) (employer's code of conduct listed forty-three acts that "constitute cause for discharge"); *Staneart v. Bd of Tr. of Ranson Memorial Hosp., No. 86-2448*, at 5 (D. Kan. Nov. 7, 1988) (employer's manual detailed examples of offenses resulting in various disciplinary action and a grievance procedure for entertaining employees' complaints on various matters, including termination). *Derstein v. State of Kansas, et al.*, No. 84-1219-K, at 3, 5 (D. Kan. April 28, 1988) (Personnel handbook provided that commission of "grievous offense" was "just cause" for termination and further outlined "just causes."); *Morriss v. Coleman Co.*, 241 Kan. at 505 (employees' bulletin stating that employees will only be discharged for good cause).

**Term of employment**

Plaintiff additionally contends that defendants breached an implied in fact contract to employ him for a fixed term, which was "during the 2005 budget cycle." Plaintiff does not specify the exact date on which the 2005 budget cycle would end, or how long his employment was expected to last, but asserts that it was close to but less than one year.[5]

Plaintiff's contention is based upon conversations he had with Mr. Osterhout during the budgeting process in November of 2004 when plaintiff went to Augusta, Georgia for the managers' planning conference. During that budgeting process for 2005, plaintiff told Mr. Osterhout that he had received several job offers but would not accept any because he expected to be employed with defendants through 2005. Plaintiff's testimony about statements made by Mr. Osterhout during the budget meeting follows:

> Q. What were those statements?
> A. Well, in the last budget cycle when Bill Kentling and I were sitting in there he said – one of the specific questions we asked was, "Okay, we deliver this $800,000, we're good for the next year?" And he said, "Absolutely, let's move forward."
> Q. What do you mean by "we're good for the next year?"
> A. That's what was the expectations. We were all on board,

---

[5]By so doing, plaintiff attempts to avoid issues with the statute of frauds.

we were all on the same course to what we were going to do.
Q.  That was a statement that you made?
A.  We asked that question specifically of Michael and he said, yes, that's exactly where we're headed and let's get it done.

Dk. 183, Exh. B, p. 59-60. Taken in context, the above statements could relate solely to the budget and not to the length of anyone's employment.

Plaintiff later clarified, however, in stating:

Q.  Did you have a conversation with Mr. Osterhout in which you told him that you expected–you were not going to take those job offers because you expected to be employed in Morris indefinitely or through 2005?
A.  I had a conversation, yes, that we – I expected to be employed through 2005.  Both Bill Kentling and I had that conversation in that last budget meeting, yes.
Q.  Did you specifically use those words that you expected to be employed through 2005?
A.  Yes.  And we expected to be there and deliver that budget. Yes, we had that conversation.
Q.  And I'm being iffy because what you're saying is two different things to me, so I want to make sure we're clear.
A.  Okay.
Q.  Did you say to Bill Kentling,[6] "I expect to be employed with Morris Communications through 2005?"
A.  Yes.
Q.  And that's separate and apart from a statement you expect to see the budget, the $800,000 budget through?
A.  That's separate and apart, but yet it ties together.  That was the commitment.  Had I known that I wasn't going to be there at that point I wouldn't have finished the budget process and I wouldn't have, you know, done the number of things that were all based upon 2005.

_____

[6]Neither party contends that the speaker intended to say Mr. Osterhout instead of Mr. Kentling.

Dk. 183, Exh. B, p. 77-78.

Taken together, plaintiff's testimony shows that he told defendants that he expected to be employed with defendants during 2005 and that he had passed up other job offers to do so.  These statements reflect solely plaintiff's unilateral expectations. The court finds Mr. Osterhout's statements above to be nothing more than "vague assurances" because they placed no substantive restrictions on the reasons the defendant could terminate the plaintiff, and were not sufficiently definite to create an implied contract when viewed in light of other evidence including the parties' prior course of dealing and defendant's written disclaimers. S*ee Hayes v. Eateries, Inc., 905 P.2d 778,* 783 (Okla. 1995); *see also Black v. Baker Tools, Inc.*, 107 F.3d 1457, 1461 (10th Cir.1997); *Russell v. Board of County Comm'rs*, 952 P.2d 492, 502 (Okla.1997).  Although an employee's acts of remaining on the job and declining other employment offers may be deemed to be sufficient consideration to support an employer's promise made after the employment relationship commences, no such promise was made here.

**Cause**

Defendants additionally contend that if either implied contract exists, they had good cause to terminate plaintiff's employment due to his

violation of the harassment policy and his failure to meet 2004

budget/expenses.   The court finds it unnecessary to examine this

contention in detail given its findings above, but agrees that the grounds for

termination stated above were put forward in good faith, were not arbitrary,

irrational, unreasonable, or irrelevant.  Defendants' good faith belief that

plaintiff had violated the sexual harassment policy and had significantly

failed to meet the 2004 budget provided good cause for plaintiff's

immediate termination, even if plaintiff had an implied contract of

employment.

### Breach of fiduciary duty

Plaintiff contends that Ms. McHaney breached her fiduciary

duty to him, her client, by lying to him.  Plaintiff asserts that Ms. McHaney

held herself out as an attorney, acted as his attorney, made affirmative

misrepresentations to him about her investigation, and had a conflict of

interest in her investigation into allegations of sexual harassment against

him. Specifically, plaintiff avers that on December 2, 2004, after Ms.

McHaney had completed her interviews, she jokingly told plaintiff that she

had gotten something bad on him, alluded to his bringing alcohol to a

company party, then said she had nothing bad on him.  Plaintiff further

alleges that Ms. McHaney defended him in the company's response to Ms.

Lacey's EEOC charge, and told him she would "defend him to the end" regarding the sexual harassment allegations.  Plaintiff concedes that Ms. McHaney was not employed by defendants as an attorney, but asserts that defendants, through their actions, held her out as an attorney.  Dk. 183, p. 54.

In support of this fiduciary duty theory, plaintiff relies upon general law establishing that a fiduciary relation does not depend upon some technical relation created by or defined in law, and exists where there has been a special confidence reposed in one who is bound to act in good faith and with due regard to the interests of the one reposing the confidence.  *Ford Guarantee Abstract & Title Co.*, 220 Kan. 244, 261 (1976), *quoting Lindholm v. Nelson*, 125 Kan. 223 (1928).  Although this is an accurate statement of law, where, as here, an attorney-client relationship is alleged, the court applies the more specific rules of law regarding the formation of that fiduciary relationship.

The court thus reviews the record to determine whether plaintiff has shown a material question of fact that an attorney-client relationship arose between himself and Ms. McHaney by implication.  In Kansas, the relationship between an attorney and client is one of agency.  *Bucher & Willis Consulting Engineers v. Smith*, 7 Kan. App. 2d 467, 469, 643 P.2d

1156 (1982). The Kansas Supreme Court has quoted the following general

rule on an implied attorney-client relationship:

> "The authority of an attorney begins with his retainer; but the relation
> of attorney and client is not dependent on the payment of a fee, nor is
> a formal contract necessary to create this relationship. The contract
> may be implied from conduct of the parties. The employment is
> sufficiently established when it is shown that the advice and
> assistance of the attorney are sought and received in matters
> pertinent to his profession." 7 Am. Jur. 2d, Attorneys at Law § 118,
> pp. 187-88.

*In re Adoption of Irons*, 235 Kan. 540, 548, 684 P.2d 332 (1984); *see also*

*Wilson v. Wahl*, 182 Kan. 532, 322 P.2d 804 (1958), and *State v. Leigh*,

178 Kan. 549, 289 P.2d 774 (1955).

   In each of the above-cited Kansas cases, the attorney-client

relationship was recognized because the client had sought and received

personal legal advice from an attorney.  In contrast, plaintiff does not allege

that he ever sought or obtained legal advice or assistance on any personal

legal issue from Ms. McHaney.  At all relevant times, his dealings with her

were strictly in his capacity as General Manager of WIBW and in her

capacity as Vice President of Human Resources.  Unlike the attorneys in

the Kansas case law, Ms. McHaney took no action directed exclusively to

plaintiff which resembles legal advice or assistance, thus the evidence

offers no basis for inferring an implied contract.  Her statements to plaintiff

that she had nothing bad on him is immaterial to the formation or existence of an attorney-client relationship.  Her statement that she would "defend him to the end," when viewed in context is a vague assurance falling short of legal advice, insufficient to form an attorney-client relationship.  *See Land v. Midwest Office Technology, Inc.*, 114 F. Supp. 2d 1121, 1147-48 (D. Kan. 2000).

The court has found no Kansas case diverging from the agency theory and recognizing an implied attorney-client relationship when an individual submits confidential information to an attorney whom he reasonably believes is acting to further his individual interest.  Other jurisdictions recognize this subjective approach, however.  S*ee e.g., Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1317-16 (7th Cir.), *cert. denied*, 439 U.S. 955 (1978); *Bobbit v. Victorian House, Inc.*, 545 F. Supp. 1124, 1126 n. 1 (N.D. Ill.1982).  This appears to be the theory on which plaintiff relies.  Even if such a subjective approach were applied here, plaintiff's proof falls short of establishing an attorney-client relationship.  Plaintiff admits to knowing that Ms. McHaney was hired as a Vice-President of Human Resources and was not hired to serve as legal counsel for defendants.  All information he gave her was in the course of her investigation on behalf of the company at a time when a reasonable

person in his position would believe she was acting to further the interest of the company and not plaintiff's individual interest, particularly if the two were not aligned in interest.  Her statement that she would "defend him to the end,"  made at a time when plaintiff's interests were aligned with those of the company against a threatened lawsuit by an ex-employee, does not, without more, warrant a reasonable belief that she was acting on plaintiff's behalf. That Ms. McHaney has completed law school and is licensed as an attorney in another state does not assist plaintiff in showing that she acted as his attorney.  Plaintiff is a General Manager of a company and a sophisticated businessman who must be imputed with the knowledge of corporate workings and the primary role of human resources when investigating allegations of sexual harassment.

Even assuming that Ms. McHaney was acting in her capacity as an attorney during her investigation provides no support for plaintiff's cause because her representation of the corporate entity does not automatically extend to its officers.  *See Professional Service Industries, Inc. v. Kimbrell*,758 F. Supp. 676, 682 (D. Kan. 1991); see also Model Rules of Professional Conduct 1.13 ("... if an organizational client requests its lawyer to investigate allegations of wrong-doing, interviews made in the course of that investigation between the lawyer and the client's employees

41

or other constituents are covered by Rule 1.6. This does not mean,

however, the constituents of an organizational client are the clients of the

lawyer."); *Professional Service Industries, Inc. v. Kimbrell*, 758 F. Supp.

676, 681 (D. Kan.,1991), quoting 1 G. Hazard and W. Hodes, The Law of

Lawyering § 1.13:102 at 387 (1990) ("The basic precept of Rule 1.13 is that

a lawyer representing an entity client does not thereby (and without more)

become the lawyer for any of the entity's members, agents, officers, or

other 'constituents,' as they are referred to in the rule; the lawyer instead

represents the entity itself.")   The court thus does not need to determine

whether the evidence shows a material question of fact that plaintiff was

damaged by any breach of fiduciary duty.  *See* Dk. 183, p. 55 (alleging

damages solely because plaintiff "lost his job because of [Ms. McHaney's]

oral report to Mr. Morris about her investigation into the harassment

allegations against him.")

   **Defamation**

         Plaintiff contends that President Morris published false and

defamatory statements about him to all WIBW staff on December 13, 2004,

when he announced plaintiff's separation from the company.  He

additionally contends that it was foreseeable that such statements would

be repeated outside WIBW, preventing him from finding another job in the

42

industry.

On December 13, 2004, after plaintiff's termination, President

Morris held an all- staff meeting with WIBW employees. The parties agree

that President Morris told staff that plaintiff was no longer associated with

the defendant(s), that defendant did not tolerate harassment, that no one is

above policies, and that a 1-800 number was available to report any sort of

harassment.  The parties dispute the content of some statements made

during that meeting which serve as the basis for plaintiff's claim of

defamation.  The parties agree that President Morris looked angry and

upset while addressing staff during this meeting.  Some employees recall

President Morris stating that plaintiff was fired and that there was a culture

of discrimination at the station, and some inferred from his statements that

plaintiff was a sexual harasser.

To prevail on his defamation claim, plaintiff must prove (1) false

and defamatory words, (2) communicated to a third person, (3) which result

in harm to his reputation. *See Dominguez v. Davidson*, 266 Kan. 926, 930,

974 P.2d 112, 117 (1999).  Injury to reputation is not presumed under

Kansas law.  *See Gobin v. Globe Publ'g Co.*, 232 Kan. 1, 6, 649 P.2d 1239,

1244 (1982).  Rather, to survive summary judgment, plaintiff must present

some evidence that defendant's statements caused identifiable damage to

his reputation. *See id.* Plaintiff can prove such damage by showing that (1) persons were deterred from associating with him; (2) his reputation has been lowered in the community; or (3) his profession suffered. *See Ali v. Douglas Cable Communications, Ltd.*, 929 F. Supp. 1362, 1385 (D. Kan.1996) (citing *Hartman v. Meredith Corp.*, 638 F. Supp. 1015, 1017 (D. Kan.1986)). Injury to plaintiff's own sensibilities is not enough to support a claim of defamation. *See St. Catherine Hosp. of Garden City v. Rodriguez*, 25 Kan. App. 2d 763, 768, 971 P.2d 754, 758 (1998) (quoting *Lindemuth v. Goodyear Tire & Rubber Co.*, 19 Kan. App. 2d 95, Syl. ¶ 5, 864 P.2d 744 (1993)).

The parties have stipulated that following plaintiff's termination, he applied for positions with other media companies in the Topeka, Kansas area but received no interviews or job offers. Dk. 168, p. 10. This generic agreement fails to inform the court of how many applications plaintiff submitted, when plaintiff submitted them, whether the applications were submitted for open positions, or whether the positions applied for bore any resemblance to those plaintiff had held in the past. Even if the court assumes facts favorable to plaintiff on each of those unstated matters, however, plaintiff presents no evidence that any potential employer to which plaintiff submitted an application had any knowledge of defendants'

statements.

The sole evidence submitted by plaintiff to fill this causal void is an affidavit by Jim Dodson, a man who has known plaintiff for 31 years and who has had a professional relationship with plaintiff for about 15 years. He avers that in September of 2005, nine months after plaintiff's termination, he was told, "in confidence, by a lady who was at [defendants'] front desk that [plaintiff] had been fired for alleged sexual harassment.  Dk. 183, Exh. QQ.  He further states:  "I have talked to other people and, in some cases, they did know [plaintiff] had been fired, but did not know why. Other advertising agency staff members of local T.V. and radio stations were also aware of [plaintiff's] termination."

On this record, plaintiff has not presented sufficient evidence that defendant's statements harmed his reputation. *See, e.g., McCauley v. Raytheon Travel Air Co.*, 152 F. Supp. 2d 1267, 1277 (D. Kan. 2001) (plaintiff must provide evidence which links false statement to inability to gain employment).  Mr. Dodson does not allege that he was a potential employer of plaintiff.  Further, the information he was told by the person at WIBW's front desk, *i.e.*, that plaintiff was terminated for alleged sexual harassment, was true.  Mr. Dodson's remaining statements about "other people" do not allege that defendants conveyed false information to anyone

45

about plaintiff, and do not allege that persons who "were aware of plaintiff's termination" either knew why plaintiff had been fired or had been so informed by defendants.  Because plaintiff fails to raise a material question of fact that any potential employer was influenced not to consider plaintiff because of any false statements about him, defendants are entitled to summary judgment on the defamation claim.  The court finds it unnecessary to reach defendant's alternative contention that President Morris' statements were protected by a qualified privilege and were made without malice.

**Wage claim**

Plaintiff contends that defendants failed to pay him all commissions and vacation pay due upon his termination from the company.

**Vacation**

The parties agree that plaintiff's final check included an amount for vacation pay which was based solely on plaintiff's base pay or salary, without his commission. Plaintiff believes that his final vacation pay should have been calculated based on his total annual earnings for the year 2004 rather than solely on his base pay.  Plaintiff contends defendant's past practice was to calculate accrued vacation pay by using an employee's

daily rate of pay which was calculated by adding the employee's

commissions and base pay for the prior year, dividing that amount by 52

(weeks per year) then dividing that amount by 5 (days per week).

Defendant counters that its past practices are irrelevant and

that its consistent practice after April of 2004 until and after the time of

defendant's termination in December of 2004 was to calculate final

vacation pay for salaried employees by using the terminated employee's

base salary only, not including commissions.  This is supported by the

testimony of Ms. Stern (WIBW's Business Manager), whose responsibility it

was in 2004 to calculate the final paycheck for terminated employees, as

well as the testimony of Dennis Kelly, WIBW's Controller at that time.

Ms. Stern specifically asked corporate about whether plaintiff's

final vacation pay should be based on his base pay only or on his base pay

plus the monthly override, and received confirmation that the amount

should not include the override.  Corporate's response stated:

> For Craig's vacation calculations, use Craig's base salary.  Although I
> don't personally agree with paying a terminating employee for
> accrued time not yet awarded, once again take the high road and pay
> him for those hours too.  The hourly rate for this vacation pay should
> not include any calculation for commission overrides, because he can
> be paid for those overrides only once.  Include this vacation pay in
> his final check.

Dk. 183, Exh. PP.

Plaintiff's proposed manner of calculating vacation pay is supported by the testimony of Carol Hill, but it is unclear whether the method she used was applicable to plaintiff, because he was not a sales person.  Ms. Hill first testified that for salespersons who are paid "basically by commissions," she looked at their previous years' annual salary (which included commissions), divided that by 52 (weeks per year) then divided by 5 (days per week) to get a daily rate for vacation accrual.  Dk. 183, Exh. N, p.12-14.  Plaintiff was not a salesperson who was paid basically by commission.  She was then asked:  "Did you use this formula for all the persons who were paid by – in part by commissions?"  She responded," Yes, for everyone."  *Id.,* p. 14. On cross-examination, Ms. Hill agreed that when calculating final vacation pay, she used the form relied upon by defendants, which says that vacation pay is calculated based on "base salary," and that base salary usually includes base pay per hour and not commissions.  However, she clarified that since sales persons have no base pay per hour, she asked how to calculate vacation pay and was instructed to "use last year's annual salary for a base for commissioned people."  *Id.*, p. 56-57.

Regardless of whether plaintiff was or was not considered to be such a commissioned person, Ms. Hill's testimony is immaterial because

Ms. Hill left defendant's employment in 2003.  Her testimony about defendants' practices in and before 2003 is not sufficient to raise a material question of fact about defendants' practices during the relevant time period, which evidence is undisputed.

**Commissions**

Plaintiff additionally contends that the amount of payment he received for his final commission override was incorrect.  It is undisputed that in addition to his base salary, plaintiff was to be paid a 3.2% monthly commission override of the net monthly revenue WIBW earned.  It is further agreed that plaintiff's commission was not based on any sales he personally made, but was based upon the net revenue generated by the entire staff at WIBW. Soon after his termination on December 13, 2004, plaintiff was paid an override for 3.2% of the net revenue that WIBW had billed through December 31, 2004. Plaintiff contends that he is entitled to receive an override on all sales that were "booked"[7] as of the date of his termination, whenever it was thereafter collected by WIBW, for an indefinite duration.

---

[7]Commissions that were "booked" had been written up and entered into the traffic system at the time of the employee's termination, but had not been billed.

Governing law requires that "commissioned salespersons" be paid "commissions earned through the last day of the contractual relationship...."  K.S.A. § 44-342.  The statute defines a "commissioned salesperson" as "a person who contracts with and is authorized by a principal to solicit within this state wholesale orders for that principal for merchandise to be shipped into this state or services to be performed within this state and who is compensated therefor by commission."  KSA § 44-341(a).  Because none of plaintiff's duties as a general manager included contracting with or soliciting wholesale orders for WIBW for merchandise or services, plaintiff was not a "commissioned salesperson" within the meaning of this statute.

Plaintiff confirmed that he was not a commissioned salesperson in his deposition:

> Q.  And Mr. Pauzauskie referred to you earlier as a commissioned salesperson, you were not employed by WIBW as a commissioned salesperson, you were the general manager who received an override based on the net revenue of the entire station. Isn't that correct?
> A.  That is correct.

Dk. 183, Exh. A-1, p. 346.

Additionally, the statute defines "earned commissions" in a manner inconsistent with plaintiff's contention that he should receive

commissions on sales not yet paid to WIBW.  It states earned

commissions" "means commissions with respect to services or

merchandise which actually has been delivered or furnished to, accepted

by *and paid for by the customer* by the last day of the commission

salesperson's contractual relationship."  KSA  § 44-341(b). (emphasis

added).

Plaintiff's weightiest argument is pursuant to KSA § 44-347,

which provides:

> Nothing in this act shall be construed to prevent a commission
> salesperson from collecting commissions on merchandise ordered
> prior to the last day of the contractual relationship but delivered,
> accepted or paid for after termination of the contractual relationship...

This statute permits a commission salesperson to collect commissions

based upon business sold but not yet collected prior to termination, but

does not require the employer to pay such commissions.  Absent a

contractual provision requiring the payment of such commissions, a plaintiff

is relegated to proving that they are owed by virtue of the employer's policy

and practice.

Plaintiff contends that defendants had a policy and practice to

pay terminated employees all commissions that had been booked at the

time of their termination, citing the testimony of Bill Kentling.  Mr. Kentling

51

Case 5:05-cv-04143-SAC-KGS   Document 191   Filed 01/31/07   Page 52 of 55


was the general sales manager with WIBW, responsible for the activity of the sales managers and of the sales staff at the time plaintiff was terminated. He stated that his personal practice with terminated employees was to pay them for the money they had on the books, but that he was unaware of whether or not this was defendants' policy. Dk. 183, Exh. Y, p. 50-51. He believed that one terminated sales manager, Kevin Mott, had been paid for the sales that he had booked. *Id.*, p. 52. Mr. Kentling admits, however, that he never saw or knew the amount of a person's final paycheck, as he just sent information about business booked up the chain of command to those responsible for issuance of checks. *Id.*, p. 54.

Weightier testimony supporting plaintiff is given by Carol Hill, who testified that when a salesperson who resigned or was terminated could subsequently receive payment for sales booked or written up. She paid those commissions to the employee in the next payroll following WIBW's receipt of the invoiced payment for that sale. *Id.*, Exh. N. p. 10 - 11, and specifically recalled having done so for four named employees.[8]

---

[8]Defendants present undisputed evidence that three of the four persons named by Ms. Hill were not terminated but voluntarily resigned. The fourth was Kevin Mott, whose final paycheck was determined not by Ms. Hill, but by Ms. Stern.

She stated that had she been the business manager at the time of plaintiff's termination, she would have paid commissions to him once defendants received the money due on the underlying sales contracts on which plaintiff's commissions were based. *Id.* She however, was not employed with defendants at the relevant time and demonstrated no basis for knowledge of what defendants' policies or practices were in 2004.

Plaintiff named several terminated employees who were paid for sales booked but not yet billed, prior to his termination. But several of those employees  resigned and were not terminated,[9] and another, Mr. Mott, is addressed separately below. Some left prior to the date Ms. Stern was hired,[10] so are not demonstrative of what defendants' policy or practice was at the relevant time.

Ms. Stern was responsible for making final payments to terminated employees at the relevant time. She testified that Company policy was not to pay commissions past a terminated employee's last month of employment. Instead, a terminated employee would receive his

---

[9]Torri Morris, Christina Verbanic, Bill Kentling, and Kevin Wagner. See Dk. 176, Exh. 6; Dk. 183, Exh. A, p.11-12; Dk. 183, Exh. Y, p. 44.

[10]Torri Morris, Christina Verbanic, and Kevin Wagner.

final commission check either in the next payroll, or two weeks later on the following pay period, depending on when the termination fell during the month.

Ms. Stern calculated Mr. Mott's final commission payment, and said that Mr. Mott was actually paid based only on his business billed through his last month of employment with the company, per company policy. Dk.183, Exh. DD, p. 50 -51. Other terminated employees were treated the same, being paid only for commissions that had been billed through their last month of employment. *Id.*, p. 51.

The court finds Ms. Stern's testimony to be undisputed. Mr. Kentling admitted that he was not responsible for determining the amount of a person's final paycheck and had no knowledge of such amounts, including Mr. Mott's. Ms. Hill failed to distinguish between employees who resigned and those who were terminated, and had no knowledge of what defendant's practices were at the relevant time. Accordingly, the court finds no question of material fact regarding the amount of plaintiff's final pay regarding his vacation or commission payments.

**Damages**

Defendants additionally seek summary judgment on the majority of plaintiff's damages, urging application of the after-acquired

54

evidence doctrine. Specifically, defendant contends that this doctrine limits plaintiff's recovery of front pay, back pay, and injunctive relief to amounts from the date plaintiff was terminated to the date(s) defendant discovered new evidence which would have independently led them to terminate plaintiff. Such evidence consists of sexually explicit e-mails found on plaintiff's office computer in late December of 2006, in violation of defendant's electronic communications policy, and Kim Stolle's testimony during her deposition on June 9, 2006 about plaintiff's sexual harassment. Given the court's rulings above, the court finds it unnecessary to reach this issue.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment (Dk. 175) is granted, and that plaintiff's motion for summary judgment (Dk. 172) is denied to the extent it remains pending.

Dated this 31st day of January, 2007, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge